J-A25033-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| K.H. INVESTORS, INC., D/B/A DOGGIE STYLE PETS, AND HOWARD NELSON | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| SPECTOR GADON ROSEN VINCI, P.C., PAUL ROSEN, AND ANDREW DEFALCO, ARIELLE ROEMER, AARON KAPLOWITZ AND STEVEN ROEMER | : : : : : : : : | No. 444 EDA 2024 |
| APPEAL OF: ARIELLE ROEMER, AARON KAPLOWITZ AND STEVEN ROEMER | : : : : | |

Appeal from the Order Entered January 22, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 230801500

BEFORE: OLSON, J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED NOVEMBER 14, 2025**

Arielle Roemer, Aaron Kaplowitz, and Steven Roemer (collectively, "Appellants") take this interlocutory appeal as of right from the order overruling their preliminary objection to compel arbitration of the wrongful use of civil proceedings and civil conspiracy claims brought against them by K.H. Investors, d/b/a Doggie Style Pets, and Howard Nelson[1] (collectively,

---

[1] Howard Nelson ("Nelson") is the president of K.H. Investors, Inc., d/b/a Doggie Style Pets.

"DSP").[2]   Because DSP's second amended complaint alleges facts and claims that fall within the scope of the subject arbitration agreement, we reverse in part, vacate the order, and remand for further proceedings consistent with this decision.

At the outset, we note this instant appeal involves a narrow issue: whether DSP's present claims against Appellants for wrongful use of civil proceedings and civil conspiracy fall within the scope of an arbitration clause. However, DSP's present action derives from prior actions and a first round of litigation, which began with a dispute over the welfare of two dogs after being groomed at one of DSP's shops, but which evolved into hard-fought litigation over Appellants' and DSP's reputational interests.[3]   Because the first round of litigation, in which DSP prevailed at arbitration, provides necessary background to the narrow issue in the present appeal, we begin with a summary of the factual and procedural history of the prior litigation.

_____

[2] *See* Pa.R.A.P. 311(a)(8); *In re Estate of Atkinson*, 231 A.3d 891, 897 (Pa. Super. 2020).  The remaining defendant in the present action, Spector Gadon Rosen Vinci, P.C., and Attorneys Paul Rosen and Andrew DeFalco, individually ("the remaining defendants"), have not participated in this appeal.

[3] There were three separate actions that led to the first round of litigation.   At case number 190606357 ("No. 6357"), Appellants initiated an action against DSP by writ of summons in June 2019.  At case number 190704678 ("No. 4678"), DSP initiated an action against Appellants in August 2019.  At case number 191102860 ("No. 2860"), Appellants filed a separate complaint in November 2019.  As discussed in more detail below, DSP's action at No. 4678 became the lead case in the prior litigation after Appellants discontinued their actions at Nos. 6357 and 2860 and filed counterclaims in DSP's action.

In 2019, Appellants Arielle Roemer ("Arielle") and Aaron Kaplowitz ("Kaplowitz") were married, and they owned two Maltese dogs, "Teddy" and "Oliver." *See* Appellants' Compl., No. 2860, 11/21/19, at 1, 16-17.[4] On June 4, 2019, when Teddy and Oliver were twelve years old, Arielle took them to DSP's shop for grooming. *See id*. at 4. A contract for DSP's grooming services, signed by Arielle in 2018, contained the following arbitration provision, which is a subject of the present appeal:

> Any controversy or claim arising out of or relating to this contract or the breach thereof, or as the result of any claim or controversy involving the alleged negligence by any party to this contract, shall be settled by arbitration in accordance with the rules of the American Arbitration Association and judgment upon the award rendered by an arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall, as part of the award, determine an award to the prevailing party of the costs of such arbitration and reasonable attorney's fees of the prevailing party.

**See** Appellants' Prelim. Objs., Ex. A (hereinafter, "arbitration agreement").[5]

Appellant Steven Roemer ("Steven"), Arielle's father, picked up Teddy and Oliver from DSP's shop, and, at that time or shortly afterwards, the dogs appeared to be in distress. **See** Appellants' Compl., No. 2860, 11/21/19, at

---

[4] DSP attached Appellants' prior complaint in No. 2860 as Exhibit B to the second amended complaint in the present action. We note that DSP disputes whether Steven had an ownership interest in Teddy and Oliver, but emphasizes Steven funded the first round of litigation on behalf of Arielle, his daughter, and Kaplowitz, his son-in-law. **See** DSP's Second Am. Compl., 4/11/23, at 12.

[5] A copy of the contract for DSP's dog grooming contract, which contained DSP's arbitration agreement, was also attached to DSP's second amended complaint in the present action as part of Exhibit C.

Teddy died later that same day, and Oliver required veterinarian care. *See id*. at 28-29. Appellants contacted DSP throughout the day, and DSP assured them that the groomer assigned to Teddy and Oliver would be suspended and there would be a full investigation. *Id*. at 25-27, 29; *see also* Appellants' Notice of Pre-Compl. Disc., No. 6537, 6/18/19, at 3.[6] DSP invited Appellants to participate in its investigation, view video recordings from the store, and speak to DSP employees, but Appellants did not accept the invitation. *See* DSP's Second Am. Compl., 4/11/23, at 16.

In the days that followed, Appellants and DSP exchanged text messages and emails. DSP suggested they were not at fault because there was evidence, including a video recording, showing that Teddy and Oliver appeared healthy when leaving the store with Steven. *See* Appellants' Compl., No. 2860, 11/21/19, at 30-31. Meanwhile, Appellants maintained the dogs were "on 'death's door'" when Steven picked them up after the grooming. *Id*. at 30. Further, Appellants were unsatisfied with DSP's investigation, in particular, the absence of any video clearly showing the groomer handling Teddy and Oliver on the grooming table. *See id*. at 30-39. Appellants began asserting that DSP had "intentionally killed" Teddy, "almost killed" Oliver, and

_____

[6] DSP attached a copy of Appellants' notice of pre-complaint discovery as Exhibit A to the second amended complaint in the present action.

was engaging in a "cover up." *Id*. at 12; Notice of Pre-Compl. Disc., No. 6537, 6/18/19, at 3.[7]

On June 18, 2019, the first round of litigation began when Appellants—who were represented at the time by the remaining defendants—filed a writ of summons in Philadelphia. *See* DSP's Second Am. Compl., 4/11/23, at 5 & Ex. A. Appellants also filed a notice of pre-complaint discovery, which included statements that DSP "intentionally killed" Teddy and "almost killed" Oliver to support requests for information. Notice of Pre-Compl. Disc., No. 6537, 6/18/19, at 3. Appellants claimed further information was necessary to plead claims against DSP for breach of contract, breach of warranty, and violations of consumer protection laws. *See id*. Appellants eventually discontinued this action before filing a complaint.

Meanwhile, DSP began receiving comments that Teddy and Oliver had suffered lacerations, or were drowned, at their store, and they noticed an increase in cancellations of grooming appointments. *See* Award of Arbitrator, 8/22/22, at 17.[8] DSP, through counsel, issued a cease-and-desist letter

_____

[7] Appellants' court filings expressed concerns about the possible misuses of "groomers helpers," collar-like loops on a grooming table placed around a dog's neck or that the groomer assigned to the dogs mistreated them. *See* Appellants' Compl., No. 2860, 11/21/19, at 8-10.

[8] DSP attached the award of the arbitrator in the prior litigation as Exhibit D to the seconded amended complaint in the present action.

After Appellants began the first round of litigation, DSP offered Appellants a settlement based on its payment of Oliver's veterinarian bills and a proposal
*(Footnote Continued Next Page)*

demanding Appellants stop spreading false statements about DSP's treatment of Teddy and Oliver. ***See id***. at 7. DSP also prepared a two-page statement to give to customers who asked about the pending litigation. ***See id***. at 9-13.[9]

In July 2019, a necropsy report determined Teddy died due to pulmonary edema (fluid in the lungs) and had a pre-existing heart condition that contributed to his death. ***See id***. at 8. However, there was no definitive cause of Teddy's death or Oliver's injury. ***See id***. at 9.

In August 2019, DSP commenced its own separate action against Appellants claiming defamation based on the spread of Appellants' statements that DSP had killed Teddy, almost killed Oliver, and engaged in a cover up ("DSP's defamation action").[10] ***See id***. at 17; ***see also*** DSP's Second Am. Compl., 4/11/23, at 8.

_____

to pay nominal value for the loss of Teddy. ***See*** DSP's Second Am. Compl., 4/11/23, at 7. A remaining defendant, one of Appellants' counsel at the time, responded Appellants sought treble damages and attorney's fees under the consumer protection law, as well as publicity over what DSP did to kill Teddy and almost kill Oliver. ***See id***.

[9] Although Appellants asserted that DSP distributed the two-page statement to hundreds or thousands of customers, the arbitrator found five or six people received the statement. ***See*** Award of Arbitrator, 8/22/22, at 13.

[10] DSP raised additional claims of false light and commercial disparagement, but by the conclusion of the first round of litigation abandoned those claims. ***See*** Award of Arbitrator, 8/22/22, at 1 n.1. As discussed in the arbitrator's award, Appellants published statements about DSP's treatment of the dogs to their neighbors and relatives, as well as Teddy and Oliver's dog-walker Caroline Shatz ("Shatz"). ***See id***. at 20.

In November 2019, Appellants commenced a separate action against DSP, this time by filing a complaint. *See* DSP's Second Am. Compl., 4/11/23, at 8. While Appellants' complaint repeatedly suggested that Teddy choked to death at DSP's shop, and Oliver suffered similar injuries, Appellants only raised claims for defamation and false light based on DSP's two-page statement to its customers. *See* Appellants' Compl., No. 191102860, 11/21/19, at 5, 11, 26, 28, 50-51. According to this complaint, DSP's two-page statement implied Appellants were "money-grubbing liars" who likely injured their own dogs and then blamed DSP. *Id*. at 48-51.

Appellants subsequently discontinued their own actions against DSP but re-raised their claims for defamation and false light as counterclaims in DSP's August 2019 defamation action. Appellants added a counterclaim for abuse of process asserting that DSP's defamation action was intended to "bully, harass, and intimidate" them to exonerate DSP. *See* Appellants' Countercl. & Joinder Compl., No. 4678, 1/14/20, at 87.[11]

---

[11] DSP attached Appellants' counterclaim and joinder complaint as a part of Exhibit C to its second amended complaint in the present action. We note that Appellants had sought to join Ken Karlan ("Karlan"), a co-owner and financial officer or director of K.H. Investors, Inc., since filing its complaint in November 2019. It is unclear whether Karlan participated in the first round of litigation, and the arbitrator did not discuss Karlan in its award. Karlan is not a party in the present action.

As noted by DSP, around the time Appellants filed their counterclaims and joinder complaint, a remaining defendant, one of Appellants' counsel at the time, made statements to a newspaper that Teddy choked to death and DSP had engaged in a campaign to blame Appellants for Teddy's death to protect
*(Footnote Continued Next Page)*

The trial court, in this first round of litigation, sustained DSP's preliminary objection to enforce the arbitration agreement and transferred Appellants' counterclaims to arbitration. *See* Order, 10/23/20, No. 4678, at 1.[12] Additionally, the court, invoking the consolidation provision in Pa.R.Civ.P. 213(a), also ordered DSP's claims against Appellants to arbitration. *See id*.

In August 2022, an arbitrator found in favor of DSP and against Appellants on all claims and counterclaims.[13] The arbitrator determined that the weight of the evidence, which included a review of the necropsy report and testimony from treating veterinarians and proffered experts, established that Teddy had died from a heart issue, not choking as suggested by Appellants. *See* Award of Arbitrator, 8/22/22, at 9. The arbitrator concluded Appellants were negligent when insisting that DSP killed Teddy and almost killed Oliver. *See id*. at 18-19. The arbitrator rejected all of Appellants' counterclaims for defamation, false light, and abuse of process reasoning that: (1) nothing in DSP's two-page statement sustained a counterclaim for defamation; (2) DSP's distribution of two-page statement to five or six people did not establish a counterclaim for false light; and (3) DSP brought its

_____

their own sales and profitability. *See* DSP's Second Am. Compl., 4/11/23, at 9-10; *see also* Award of Arbitrator, 8/22/22, at 14-15.

[12] DSP attached the prior order directing arbitration as part of Exhibit C to its second amended complaint in the present action. However, the basis for DSP's preliminary objection or the trial court's ruling to direct arbitration of Appellants' counterclaims is not apparent in the record.

[13] The arbitrator referred to Appellants as claimants.

defamation action against Appellants for the legitimate purpose of stopping Appellants' spread of false information about Teddy and Oliver's treatment at DSP's store, which precluded Appellants' abuse of process counterclaim against DSP. *See id*. at 16-17.

The arbitrator awarded DSP $130,001.00 in damages for the lost profit and business and individual damages caused by Appellants' defamatory comments. *See id*. at 25. The arbitrator did not award attorney's fees or punitive damages. *See id*. at 26. DSP subsequently asked the arbitrator to mold the award to include their attorney's fees, but the arbitrator denied the request because the arbitrator lacked jurisdiction after issuing a final award, DSP did not raise or submit the issue of fees and costs before or at the arbitration hearing, and the invoice to support DSP's request was inadequate. *See* Order of the Arbitrator, 9/15/22, at 1-3. The arbitrator's award was entered as a judgment as of January 19, 2023. *See* Order, No. 4678, 3/3/23, at 1.

In short, DSP prevailed in the first round of litigation on their claims that Appellants had published false statements that DSP caused the dogs' injuries and against Appellants' counterclaims that DSP had defamed Appellants and abused the legal process to silence Appellants from seeking the truth about their dogs. With this background in mind, we briefly summarize the procedural history leading to the instant appeal.

In February 2023, DSP commenced this second round of litigation, the present action against Appellants and Appellants' counsel, in the first round of

litigation by filing a complaint in Chester County. DSP asserted claims for wrongful use of civil proceedings and civil conspiracy based, in relevant part, upon Appellants' false accusations—*i.e.* that DSP had killed Teddy, almost killed Oliver, and concealed video evidence—as well as Appellants' conduct during the first round of litigation. *See* DSP's Second Am. Compl., 4/11/23, at 15-20. DSP further asserted that Appellants, in a conspiracy with the remaining defendants, sought to inflict maximum financial and emotional pressure on DSP, attempted to extort a monetary payment unrelated to the merits of their claims, and prevented the community from knowing that Appellants had contributed to Teddy and Oliver's poor condition before going to DSP's store. *See id*. at 19-21.

Appellants and the remaining defendants filed preliminary objections. The Chester County court sustained a preliminary objection to venue and transferred the action to Philadelphia. The Chester County court did not rule on the remaining preliminary objections, including Appellants' request to compel arbitration of DSP's present action based on the arbitration agreement in the dog grooming services contract. On January 22, 2024, the trial court, in Philadelphia, entered an order summarily overruling Appellants' remaining preliminary objections. Appellants timely appealed the denial of its request to compel arbitration. The trial court did not order a Pa.R.A.P. 1925(b) statement but issued an opinion concluding that DSP's present claims against Appellants did not fall within the scope of the arbitration agreement.

Appellants raise the following issue for our review:

Whether the trial court erred in overruling [Appellants']
preliminary objection to compel arbitration, where [DSP's] claims
against [Appellants] are subject to a valid agreement to arbitrate
contained within the contract for grooming services?

Appellants' Brief at 6.

When reviewing an order overruling a preliminary objection seeking to enforce an arbitration agreement, a court "must determine: (1) whether a valid agreement to arbitrate exists; and (2) whether the dispute falls within the scope of the arbitration agreement. If these two requirements are satisfied, the dispute must be submitted to arbitration." *Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, 166 A.3d 465, 472 (Pa. Super. 2017) (internal citation omitted). When conducting this review, this Court "is limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion in denying the petition." *Carvell v. Edward D. Jones & Co., L.P.*, 294 A.3d 1221, 1230 (Pa. Super. 2023) (internal citation omitted).

Our review is further guided by the following principles:

(1) arbitration agreements are to be strictly construed and not extended by implication; and (2) when parties have agreed to arbitrate in a clear and unmistakable manner, every reasonable effort should be made to favor the agreement unless it may be said with positive assurance that the arbitration clause involved is not susceptible to an interpretation that covers the asserted dispute.

To resolve this tension, courts should apply the rules of contractual constructions, adopting an interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable, and natural conduct to the parties. In interpreting a contract, the ultimate goal is to ascertain and

- 11 -

give effect to the intent of the parties as reasonably manifested by the language of their written agreement.

*Provenzano v. Ohio Valley Gen. Hosp.*, 121 A.3d 1085, 1095 (Pa. Super. 2015) (internal citation and indentations omitted). To the extent the issue on appeal involves the interpretation of a contract, our standard of review is *de novo*, and our scope of review is plenary. *Gaffer Ins. Co., Ltd. v. Discover Reinsurance Co.*, 936 A.2d 1109, 1112 (Pa. Super. 2007). When assessing whether a dispute falls within the scope of an arbitration agreement, a court "must consider the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Saltzman*, 166 A.3d at 476.

Appellants argue the arbitration agreement in the dog grooming services contract was valid, broadly phrased to include all disputes relating to DSP's grooming services, and included DSP's present claims for wrongful use of civil proceedings and civil conspiracy against them. *See* Appellants' Brief at 12-13, 15-19, 20-25. Appellants contend DSP's present claims all arise out of or relate to the grooming services DSP provided and whether DSP harmed Teddy and Oliver while at DSP's store. *See id*. at 18. Additionally, Appellants assert that DSP's present action essentially seeks fees and costs for the first round of litigation, which were all covered by DSP's arbitration agreement, and which DSP should have sought during that litigation. *See id*. at 19. Appellants emphasize that it would be unfair to prevent them from enforcing the same arbitration agreement DSP previously used to compel arbitration of Appellants' claims in the first round of litigation. *See id*. at 13-15. Appellants further fault the trial court for denying their request to compel arbitration based on

the alleged conduct of the remaining defendants during the first round of litigation. *See id*. at 23-25.

The trial court concluded there was a valid arbitration agreement between the parties, but DSP's arbitration agreement did not cover DSP's present claims. *See* Trial Ct. Op., 2/13/24, at 3. The trial court outlined the substance of DSP's present claims as follows:

> 1) Appellant[s] and their attorneys[, the remaining defendants,] allegedly acted in a grossly negligent manner without probable cause by instituting and maintaining claims against [DSP] that were based on false, malicious, and meritless accusations, barred by Pennsylvania law, and Appellant[s'] attorneys allegedly approached third-party witnesses, unlawfully encouraged them to recant prior statements and/or coached the third-party witnesses on what to produce and say, and/or assisted in creating false exculpatory evidence; 2) the [Appellants' claims in the first round of litigation were] allegedly brought for the improper purposes of harassing and harming [DSP], to extort settlement from [DSP], and to generate and cost exorbitant legal fees; and 3) the outcome of the [first round of litigation] was an arbitration award in favor of [DSP] and against Appellant[s]. The substance of the civil conspiracy complaint is that [Appellants] and their attorneys acted in concert when initiating and maintaining the alleged abuse of civil process.

*Id*. at 4-5. As noted, the trial court characterized DSP's present claims as sounding in abuse of process, rather than DSP's actual claim of wrongful use of civil proceedings, and reasoned that there was "no nexus" between the claims and the grooming services contract. *See id*. at 5.[14] The trial court

---

[14] As this Court has stated, "an action for wrongful use of civil proceedings differs from an action for abuse of process" *Rice Drilling B, LLC v. Scott*, 325 A.3d 663, 681 (Pa. Super. 2024) (internal citation, quotation marks, and citation omitted). "The gist of an action for abuse of process is the improper
*(Footnote Continued Next Page)*

explained DSP's present claims encompassed Appellants' alleged conduct during litigation and would not support a breach of contract claim under the grooming services contract. *See id*. The trial court added it was "difficult to believe the parties intended [DSP's arbitration agreement] to cover potential, future actions based on unlawful, improper conduct" and refused to extend the scope of the DSP arbitration agreement by implication. *Id*.

Following our review, we conclude that given the broad language of the arbitration agreement, the trial court's analysis was too narrowly applied. Initially, the operative language of DSP's dog grooming services contract stated DSP would provide services in a "caring, responsible manner," and required arbitration of "[a]ny controversy or claim arising out of or relating to this contract or the breach thereof, or as the result of any claim or controversy involving the alleged negligence by any party to this contract . . . ." *See* Appellants' Prelim. Objs., Ex. A. As Appellants note, the arbitration clause was broad in scope, and, by its express terms, included claims related to a breach of grooming contract and related claims in tort. When faced with such broad contractual language, this Court has stated:

---

use of process after it has been issued, that is, a perversion of it[; wrongful] use of civil process has to do with the wrongful initiation of such process." *Hart v. O'Malley*, 647 A.2d 542, 546 (Pa. Super. 1994). In an abuse of process claim, "the existence of probable cause to employ the particular process for its intended use is immaterial." *Rice Drilling*, 325 A.3d at 681. The elements of an abuse of process claim are that the defendant: (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed, and (3) caused harm to the plaintiff. *See id*. at 680.

- 14 -

> A broad arbitration clause in a contract is one that is unrestricted, contains language that encompasses all disputes which relate to contractual obligations, and generally includes all claims arising from the contract regardless of whether the claim sounds in tort or contract. Thus, where the arbitration provision is a broad one, and in the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.

*Saltzman* 166 A.3d at 476-77 (internal citations and quotation marks omitted).[15]

Turning to DSP's present claims against Appellants, we note that wrongful use of civil proceedings (as opposed to abuse of process) has three elements: (1) the termination of the prior litigation in DSP's favor; (2) the procurement, initiation or continuation of the prior litigation without probable cause or by acting in a grossly negligent manner; and (3) an improper purpose other than securing proper discovery, joinder of parties, or adjudication of the claim on the litigation was based. *See* 42 Pa.C.S.A. § 8351; *see also Raynor v. D'Annunzio*, 243 A.3d 41, 53 (Pa. 2020).

Civil conspiracy requires "that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Marion v. Bryn Mawr Tr. Co.*, 288 A.3d 76, 88 (Pa. 2023) (internal citations and quotations marks omitted). As suggested by the trial court, the elements of DSP's present claims appear to fall outside the scope of DSP's

---

[15] Indeed, DSP's arbitration agreement was broad with respect to obligations under the dog grooming services contract but also expressly included claims "involving the alleged negligence by any party" to the contract. *See* DSP's Arbitration Agreement.

arbitration agreement. However, a court must look at the factual underpinnings of the claims, not the legal theories of the claims. ***See Saltzman***, 166 A.3d at 476.

Here, a review of the factual underpinnings of DSP's second amended complaint does not support the trial court's determination. In particular, DSP's second amended complaint emphasized: (1) Appellants' prior notice of pre-complaint discovery, which contained statements that DSP grossly mistreated and/or intentionally killed Teddy and injured Oliver, ***see*** DSP's Second Am. Compl., 4/11/23, at 5-6; (2) Appellants' prior complaint that accused DSP of engaging in a "false scheme" to exonerate itself of fault for Teddy's death and Oliver's illness by blaming Appellants, ***id***. at 9; and (3) Appellants' insistence that the dogs were dead and dying even though Appellants did not review the results of DSP's investigation, including video recordings showing Teddy and Oliver leaving their shop with Steven in apparently good health, ***id***. at 13, 15.[16]

Furthermore, under their count for wrongful use of civil proceeding, DSP continued raising allegations that sounded in defamation, which had been arbitrated in the first round of litigation. Specifically, DSP's second amended complaint alleged: (1) "knew or should have known that their ***accusations***

_____

[16] DSP tangentially referred to Appellants' prior claims/counterclaims for defamation, false light, and abuse of process based on DSP's two-page statement, but the second amended complaint did not specifically link those averments to their present claims for wrongful use of civil proceedings. ***See*** DSP's Second Am. Compl., 4/11/23, at 14. Put differently, DSP's focus was on Appellants' accusations that DSP killed Teddy and injured Oliver.

*against [DSP]* were false, malicious, and meritless under the law[;]" (2) accused DSP, and Nelson individually, of killing Teddy and injuring Oliver without any factual basis; (3) maintained that the dogs were dead and dying when Steven picked them up; (4) falsely alleged DSP concealed video evidence; (5) falsely alleged the dogs were perfectly healthy before the grooming; (6) filed their lawsuit while claiming they had no information about Teddy's death and ignoring DSP's invitation to participate in their investigation; and (7) maintained their lawsuit even after receiving the necropsy results, video evidence, and opinions from veterinarians exculpating DSP. *Id*. at 16 (emphasis added). We add that, at several points, DSP even referred to statements that were not part of Appellants' prior litigation of defamation, false light, and abuse of process claims against DSP, but which were specifically subjects of DSP's prior claims against Appellants for defamation, namely, false rumors that the dogs suffered lacerations or were drowned. *See id*.

Thus, a review of DSP's wrongful use of civil proceedings count does not support the trial court's assertions that there was "no nexus" between DSP's present claims and the arbitration clause contained in the dog grooming services contract. DSP specifically focuses on the treatment of Teddy and Oliver during the grooming, and Appellants' lack of probable cause or gross negligence when they "rushed to judgment in defaming [DSP] and continuing the[ir] campaign to save face." *Id*. at 20. The alleged facts that Appellants falsely accused DSP of killing Teddy and injuring Oliver relate to the dog

- 17 -

grooming services contract, and DSP's arbitration agreement mandating arbitration of "[a]ny controversy or arising out of or relating to this contract or the breach thereof." DSP's Arbitration Agreement. Accordingly, we conclude DSP's arbitration agreement applies to DSP's wrongful use of civil proceedings count.[17]

We do not discount the trial court's reasoning that DSP alleged facts concerning Appellants' conduct during the first round of litigation that may not fall within the scope of DSP's arbitration agreement. This included averments that Appellants, along with the remaining defendants, sought to manufacture evidence that they did not spread the rumors that DSP killed Teddy and injured Oliver and/or that they coached witnesses to support their accusations that Teddy and Oliver had been choked while being groomed. *See* DSP's Second Am. Compl., 4/11/23, at 17-19. Other allegations included using a three-day deposition of Nelson to manufacture a legal case, conducting that deposition as a smear campaign (to the apparent amusement of Arielle, who attended the deposition), protracting the prior arbitration hearing to amend and

---

[17] Furthermore, based on the broad language of DSP's arbitration agreement and the factual bases of DSP's present claims, the trial court's concern about extending the scope of DSP's arbitration agreement by implication was misplaced. *See Saltzman*, 166 A.3d at 476-77 (discussing the interpretation and application of "broad" arbitration agreements). To the extent the trial court found it difficult to believe that the parties would have intended DSP's arbitration agreement to cover future actions based on unlawful or improper conduct, the fact that DSP previously invoked the same arbitration agreement to Appellants' prior counterclaims for defamation, false light, and abuse of process, it appears DSP construed the arbitration agreement to do exactly that.

increase the remaining defendants' legal fees, and delaying the entry of judgment on the arbitrator's award. These allegations, as suggested by the trial court, may support an abuse of process claim unrelated to the dog grooming services contract. *See generally Rice Drilling*, 325 A.3d at 681. However, that claim was not pleaded by DSP. As currently pleaded, DSP's second amended complaint raised claims against Appellants that are inextricably linked to the allegations concerning Teddy and Oliver's treatment at DSP's store. Because there was a valid agreement to arbitrate and DSP stated claims that fell within the scope of the arbitration agreement, we must conclude that claim must be submitted to arbitration. *See Saltzman*, 166 A.3d at 472. For these reasons, we reverse the trial court in part and vacate the trial court's order overruling Appellants' petition to compel arbitration.

On remand, the trial court may reconsider the second amended complaint to determine which additional facts and claims fall within the scope of the arbitration clause and entertain any further arguments from the parties as it deems necessary. Nothing in our decision precludes DSP from requesting leave to file an amended complaint.

Order reversed in part and vacated. Case remanded. Jurisdiction relinquished.[18]

_____

[18] We note that this decision may add further complexity to already protracted and lengthy litigation among the parties. However, the fact that claims by some parties were not subject to an arbitration agreement and require "piecemeal litigation" in a separate forum is not a permissible ground for
*(Footnote Continued Next Page)*

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>11/14/2025</u>

---

denying arbitration as to the claims raised by parties subject to the arbitration agreement. **See McCrossin v. Comcast Spectacor, LLC**, 311 A.3d 1115, 1123–24 (Pa. Super. 2024), *appeal denied*, 329 A.3d 582 (Pa. 2024).